IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | |
|---|---|
| ALLSTATE VEHICLE AND PROPERTY INSURANCE COMPANY,<br><br>Plaintiff,<br><br>v.<br><br>ALAN CRAWFORD and BRANDON COUCH, INDIVIDUALLY and as REPRESENTATIVE of the ESTATE OF CALEB COUCH<br><br>Defendants. | Civil Action No. 3:21-CV-2806-K |

## MEMORANDUM OPINION AND ORDER

Before the Court are Plaintiff Allstate Vehicle and Property Insurance Company's Motion for Summary Judgment (the "Motion" or "Motion for Summary Judgment") (Doc. No. 21), Brandon Couch's Response to Allstate's Motion for Summary Judgment ("Couch's Response") (Doc. No. 28), Plaintiff Allstate Vehicle and Property Insurance Company's Reply to Brandon Couch's Response to Allstate's Motion for Summary Judgment (the "First Reply") (Doc. No. 35), the Supplemental Brief in Support of Defendant Brandon Couch's Response to Plaintiff's Motion for Summary Judgment (the "Supplement") (Doc. No. 42), Defendant Alan Crawford's Response, Brief and Joinder to Brandon Couch's Response to Allstate's Motion for Summary Judgment ("Crawford's Response") (Doc. No. 43), and Reply to Defendant Crawford's Response to Allstate's Motion for Summary Judgment, and Response to

1

Defendant Couch's Supplemental Brief (the "Second Reply") (Doc. No. 40 at 7-18). The Court has carefully reviewed the Motion, the Responses, the Replies, the parties' briefs, the relevant portions of the parties' appendices, and the applicable law. Because the accident and resultant injuries arose out of the use of a motor vehicle, and because the Policy's Motor Vehicle Exclusion applies to those injuries, the Court **GRANTS** Plaintiff's Motion.

I.   Background

On July 10, 2021, 17-year-old Caleb Couch ("Caleb")—Defendant Brandon Couch's ("Couch") son and Defendant Alan Crawford's ("Crawford") step-son—was severely injured while racing at Super Bowl Speedway in Greenville, Texas. Doc. No. 22 at 7. According to Couch, "Caleb's off-road machine flipped over and trapped him inside. A large amount of fuel spilled out, the machine caught fire, and Caleb was left engulfed in flames." Doc. No. 30 at 57. Caleb tragically died from his injuries. *Id.* Alleging in part that Crawford negligently "designed and assembled the sprint-style device" in question, Couch sued Crawford in Texas state court about two months later (the "Underlying Lawsuit"). *See Couch v. Crawford*, No. 352-328677-21 (352nd Dist. Ct., Tarrant County, Tex. Sep. 9, 2021); Doc. No. 30 at 57-73.

Not long after the Underlying Lawsuit commenced, Crawford requested defense from Allstate Vehicle and Property Insurance Company ("Allstate" or "Plaintiff") under his Allstate House and Home Policy (the "Policy" or the "Homeowner's Policy"), effective from April 10, 2021, to April 10, 2022. Doc. No. 22 at 6; Doc. No. 30 at 5-

2

55 (Policy Number 844 826 575). Per Section II, Family Liability Protection-Coverage X of the Policy ("Subsection X"), Allstate has a duty to defend and indemnify Crawford against certain claims of bodily injury or property damage:

> Subject to the terms, conditions and limitations of this policy, we will pay damages which an insured person becomes legally obligated to pay because of bodily injury or property damage arising from an occurrence to which this policy applies, and is covered by this part of the policy.
>
> We may investigate or settle any claim or suit for covered damages against an insured person. If an insured person is sued for these damages, we will provide a defense with counsel for our choice, even if the allegations are groundless, false or fraudulent. We are not obligated to pay any claim or judgment after we have exhausted our limit of liability.

Doc. No. 30 at 43. Relevantly, however, the Policy limits Allstate's duty to defend and indemnify against certain claims of bodily injury or property damage involving a motor vehicle or trailer. *Id.* at 44. Specifically, Paragraph 5 of Subsection X's "Losses We Do Not Cover" portion (the "Motor Vehicle Exclusion" or "Exclusion") states:

> We do not cover bodily injury or property damage arising out of the ownership, maintenance, use, occupancy, renting, loaning, entrusting, loading or unloading of any motor vehicle or trailer.

*Id.* Eight "Exceptions" to the Motor Vehicle Exclusion appear beneath it; they state:

> We will not apply this exclusion to:
>
> a) a motor vehicle in dead storage or used exclusively on an insured premises;
> b) any motor vehicle designed principally for recreational use off public roads, unless that vehicle is owned by an insured person and is being used away from an insured premises;
> c) a motorized wheelchair;
> d) a vehicle used to service an insured premises, which is not designed for use on public roads and not subject to motor vehicle registration;

3

      e) a golf cart owned by an insured person when used for golfing purposes;
      f) a trailer of the boat, camper, home or utility type unless it is being towed or carried by a motorized land vehicle;
      g) lawn or garden implements under 40 horsepower; or
      h) bodily injury to a residence employee.

*Id.* Arguing that the Policy "does not apply to afford coverage for the claims made against him in the Underlying Lawsuit," Allstate now seeks declaratory relief from this Court regarding its rights and obligations under the Policy. Doc. No. 21 at 2; *see* 28 U.S.C. §§ 2201-02.

## II. Legal Standards

Summary judgment is appropriate when there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A fact is "material" if it could reasonably affect the outcome of the suit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute of "a material fact is 'genuine' . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* All evidence and reasonable inferences must be viewed in the light most favorable to the nonmovant. *Boudreaux v. Swift Transp. Co.*, 402 F.3d 536, 540 (5th Cir. 2005).

The parties do not dispute that Texas law governs the insurance issues in this case. *See Penn-Am. Ins. Co. v. Tarango Trucking, L.L.C.*, 30 F.4th 440, 444 (5th Cir. 2022); Doc. No. 22 at 10; Doc. No. 29 at 9. Nor do they meaningfully dispute the applicable burdens of proof. *See* Doc. No. 29 at 8; Doc. No. 35 at 9. Where a policy contains a duty to defend—as the Policy does here—the insured bears the preliminary

4

burden of establishing coverage under the terms of the policy. *Gilbert Tex. Const., L.P. v. Underwriters at Lloyd's London*, 372 S.W.3d 118, 124 (Tex. 2010) (citing *Ulico Cas. Co. v. Allied Pilots Ass'n*, 262 S.W.3d 773, 782 (Tex. 2008)). Under Texas' "eight-corners" rule, "the insurer's duty to defend is determined by comparing the allegations in the plaintiff's petition to the policy provisions, without regard to the truth or falsity of those allegations and without reference to facts otherwise known or ultimately proven." *Monroe Guar. Ins. Co. v. BITCO Gen. Ins. Corp.*, 640 S.W.3d 195, 199 (Tex. 2022) (citing *GuideOne Elite Ins. Co. v. Fielder Rd. Baptist Church*, 197 S.W.3d 305, 308 (Tex. 2006)). Significantly, "A plaintiff's factual allegations that potentially support a covered claim is all that is needed to invoke the insurer's duty to defend." *GuideOne* 197 S.W.3d at 310.

Texas' eight-corners rule "takes its name from the fact that only two documents are ordinarily relevant to the determination of the duty to defend: the policy and the pleadings of the third-party claimant." *Id.* at 308 (citing *King v. Dallas Fire Ins. Co.*, 85 S.W.3d 185, 187 (Tex. 2002)). However, based on the Texas Supreme Court's recent holding in *Monroe*, 640 S.W.3d at 195, the parties disagree as to whether the Court should consider extrinsic evidence in this case. *See* Doc. No. 35 at 9-10; Doc. No. 42 at 8. Because the Court finds that the Policy and the pleadings contain the facts necessary to resolve the question of whether the claim is covered, the Court sees no reason to deviate from the traditional eight-corners doctrine. *See Monroe*, 640 S.W.3d at 202.

Returning to the discussion of the parties' burdens, Allstate admits that "the allegations against Crawford in the Underlying Lawsuit satisfy the requisite elements of the policy's insuring agreement." Doc. No. 22 at 9. Thus, the burden shifts to Allstate to show "that the plain language of a policy exclusion or limitation allows the insurer to avoid coverage of *all* claims, also within the confines of the eight corners rule." *Penn-Am.*, 30 F.4th at 444 (citing *Northfield Ins. Co. v. Loving Home Care, Inc.*, 363 F.3d 523 (5th Cir. 2004)).

Allstate argues that the plain language of the Policy's Motor Vehicle Exclusion meets this burden. *E.g.*, Doc. No. 22 at 9, 26-29. Defendants disagree, primarily arguing that the sprint-racer is not a motor vehicle under the Policy and therefore cannot be subject to the Motor Vehicle Exclusion. *E.g.*, Doc. No. 29 at 9-13; Doc. No. 42 at 4-8; Doc. No. 43. The Policy does not define "motor vehicle." *See* Doc. No. 30 at 5-55. Thus, the Court must interpret the term in accordance with the rules of construction set by Texas law.

Texas courts generally apply the same rules to the interpretation of insurance policies as they apply to the interpretation of other contracts. *Am Nat. Gen. Ins. Co. v. Ryan*, 274 F.3d 319, 323 (5th Cir. 2001). According to the Texas Supreme Court, "the plain language of an insurance policy, like that of any other contract, will be given effect when the parties' intent may be discerned from that language. But when the language of an insurance contract is ambiguous, that is, subject to two or more reasonable interpretations, then that construction which affords coverage will be the one adopted."

6

*Glover v. Nat'l Ins. Underwriters*, 545 S.W.2d 755, 761 (Tex. 1977). Put another way, the Court "must adopt the construction of an exclusionary clause urged by the insured as long as that construction is not itself unreasonable, even if the construction urged by the insurer appears to be more reasonable or a more accurate reflection of the parties' intent." *Id.* (citing *Cont'l Casualty Co. v. Warren*, 254 S.W.2d 762, 763 (Tex. 1953)). Thus, when construing different interpretations of a clause or term in an insurance policy, the reasonableness of the proffered interpretation is key. *See id.* ("[T]hese rules of construction will be applied only when the language of the policy is such that it may reasonably be given one of several constructions."). Importantly, "An ambiguity does not arise simply because the parties advance conflicting interpretations of the contract." *Columbia Gas Transmission Corp. v. New Ulm Gas, Ltd.*, 940 S.W.2d 587, 589 (Tex. 1996) (citing *Forbau v. Aetna Life Ins. Co.*, 876 S.W.2d 132, 134 (Tex. 1994); *Sun Oil Co. (Del.) v. Madeley*, 626 S.W.2d 726, 727 (Tex. 1981)).

The parties cite many cases in which Texas courts grapple with interpreting an undefined term in an insurance policy—some even construing different interpretations of the term "motor vehicle." *E.g.*, Doc. No. 22 at 10-17; Doc. No. 29 at 9-14; Doc. No. 42 at 4-8. While this Court cannot adopt wholesale another court's reasoning and interpretation of "motor vehicle" based on a different policy with different facts, the parties' cited cases (among others the Court has identified in its own research) illustrate how Texas courts approach interpreting undefined terms. *See also* Doc. No. 42 at 5 ("It [is] not necessary to decide whether the device [is] *per se* a motor vehicle, only whether

7

the parties intended to treat it as a motor vehicle under the terms of the policy."). First, "A court's primary concern is to give effect to the intentions of the parties as expressed by the policy language." *Ryan*, 274 F.3d at 323 (citing *Ideal Lease Serv., Inc. v. Amoco Prod. Co.*, 662 S.W.2d 951, 953 (Tex. 1983)). With that, the Court must "examine the entire agreement in an effort to harmonize and give effect to all provisions of the contract so none will be meaningless." *Gilbert*, 327 S.W.3d at 126. The preceding instructions are consistent with the long-established rule that "no one phrase, sentence, or section [of a contract] should be isolated from its setting and considered apart from the other provisions." *Forbau*, 876 S.W.2d at 134 (citing *Guardian Tr. Co. v. Bauereisen*, 121 S.W.2d 579, 583 (Tex. 1938)).

To summarize, so long as it is reasonable, the Court will adopt the construction of "motor vehicle" that affords coverage. *Glover*, 545 S.W.2d at 761. Reasonableness is key. In determining the reasonableness of any proffered construction, the Court will examine it in context with the Policy's other clauses and provisions as required. *Gilbert*, 327 S.W.3d at 126. At all times in its analysis, the Court will attempt to give effect to the intentions of the parties as expressed by the Policy's language. *Ryan*, 274 F.3d at 323.

### III. Analysis

#### A. *Is the "sprint-style device" a motor vehicle within the context of the Policy?*

Plaintiff argues that the plain language of the Policy controls, as "the fuel-powered motor-driven vehicle (a sprint car) that Caleb operated at the time of the

8

accident very clearly constitutes a 'motor vehicle' within the meaning of the Allstate Policy." Doc. No. 35 at 7. Defendants argue that the term "motor vehicle" is ambiguous, and they offer four different definitions for the term—each one supposedly sufficiently reasonable to defeat summary judgment at this stage. *E.g.*, Doc. No. 29 at 9. As discussed in Section II above, however, Defendants' proffered interpretations cannot be read in isolation. Again, the Motor Vehicle Exclusion excludes from coverage "bodily injury or property damage arising out of the ownership, maintenance, [or] use . . . of any motor vehicle or trailer." Doc. No. 30 at 44. The Exceptions to the Motor Vehicle Exclusion are just that—*exceptions* to the general rule that bodily injuries or property damage arising out of the ownership, maintenance, or use of any motor vehicle are excluded from coverage. *See Penn-Am.*, 30 F.4th at 446 ("The . . . exceptions therefore reinstate coverage over certain bodily injuries and property damage that would otherwise be excluded by the Auto Exclusion . . . ."). So, the Policy apparently contemplates a broad reading of "motor vehicle," as there would be little reason to specifically except instances that would already not be subject to the Exclusion. This reasoning is applied to all of Defendants' proffered interpretations.

Could it be that the Policy did contemplate a narrower interpretation of "motor vehicle," and the Exceptions were included simply out of an abundance of caution? Such an argument seems unreasonable considering the specificity of some of the Exceptions (e.g., excepting golf carts but only when used for golfing purposes and excepting only those riding lawnmowers under 40 horsepower).

>Defendants also argue:
>
>>[T]he Allstate Policy includes references to other motor vehicles which shed light on the scope of Allstate's exclusion. . . . Allstate covers "vehicles" (not specifically "motor vehicles") used to service an insured premises not designed for use on public roads and not subject to motor vehicle registration. Finally, Allstate also expressly excludes narrower categories of vehicles, such as watercrafts, hovercrafts, and *motorized land vehicles*. These policy provisions show that Allstate could have easily broadened the scope of its exclusion, but contracted with Defendant Crawford for a more limited exclusion."

Doc. No. 29 at 12-13 (emphasis added). In other words, Defendants reason that because the Policy excludes from coverage bodily injuries and property damage from certain watercrafts (the "Watercraft Exclusion") (Doc. No. 30 at 44) and hovercrafts (the "Hovercraft Exclusion") (*id.* at 45)—two "narrower categories of vehicles"—if the parties wished to exclude sprint-racers from coverage, they would have explicitly done so.

However, depending on the definition of "motor vehicle," the Motor Vehicle Exclusion may actually serve this purpose. Moreover, it makes sense that the Policy would include a separate Watercraft Exclusion. Unlike the Motor Vehicle Exclusion, the Watercraft Exclusion does not broadly exclude a large category and then except certain things from that category. *Id.* at 44. Instead, it merely enumerates a number of specific characteristics of certain watercraft, any one of which would warrant exclusion by the Policy. *Id.* If none of the enumerated characteristics applied to a given watercraft, the Policy ostensibly would not exclude certain injuries arising out of some use of that watercraft. The Watercraft Exclusion's only *exception* involves bodily injuries to

10

residence employees. *Id.* Thus, the Watercraft Exclusion serves as a useful contrast to the Motor Vehicle Exclusion; if the Policy intended to exclude only specific types of motor vehicles and no others, the Motor Vehicle Exclusion would likely have been written like the Watercraft Exclusion.

The separate Hovercraft Exclusion does little more than suggest that hovercrafts do not neatly fit into either the Motor Vehicle Exclusion or the Watercraft Exclusion. This makes sense, as some hovercrafts can travel over both land and water.

Finally, Defendants' argument also references Exception (d). Exception (d) excepts from the Motor Vehicle Exclusion "A *vehicle* used to service an insured premises which is not designed for use on public roads and not subject to *motor vehicle* registration." *Id.* (emphasis added). Although not completely clear to the Court, Defendants seemingly intimate that because Exception (d) uses the terms "vehicle" and "motor vehicle" separately, the Policy recognizes a difference between the terms. Does this difference suggest that, under the terms of the Policy, for something to be considered a "motor vehicle" it must be subject to motor vehicle registration? The Court does not believe so. If this were the case, the Motor Vehicle Exclusion would be limited to excluding only those motor vehicles subject to motor vehicle registration. It would not be necessary to except motorized wheelchairs or certain riding lawnmowers, for example, as these are not subject to motor vehicle registration. Because it does not make sense to specifically except something from exclusion that would not be excluded

11

under a proffered interpretation, the Court does not find this argument to be reasonable.

### 1. *Defendants' First Definition*

Defendants' first definition of "motor vehicle" is "a self-propelled vehicle requiring registration and a driver's license to operate on public roads and highways." Doc. No. 19 at 9. According to this definition, then, if the device in question is not self-propelled and does not require registration and a driver's license to operate on public roads and highways, it is not a motor vehicle. Per Defendants' reasoning, because the sprint-racer ostensibly could not be registered to operate on public roads or highways, it is not a motor vehicle and thus is not subject to the Policy's Motor Vehicle Exclusion.

The Court does not find this definition reasonable for reasons very similar to those discussed above. Motorized wheelchairs and riding lawnmowers, for example, cannot operate on public roads or highways, so the registration and driver's license components of the definition would not even apply to them. Under this definition, motorized wheelchairs and riding lawnmowers would not be excluded under the Motor Vehicle Exclusion. Because it does not make sense to specifically except something from exclusion that would not be excluded in the first place, the Court does not find this definition to be reasonable.

2. *Defendants' Second Definition*

Defendants also define "motor vehicle" as "any self-propelled device 'which a person or property is or may be transported or drawn on a public highway, other than a device used exclusively on stationary rails or tracks.'" Doc. No. 29 at 10, 11; Doc. No. 42 at 7 (citing Tex. Trans. Code §§ 502.001(25), (45)). Defendants argue that the "Texas legislature limits the definition of 'motor vehicle' to a self-propelled device which travels on public roads," and they acknowledge that "The device was not intended for operation on public roads or highways." Doc. No. 42 at 7, 8; Doc. No. 29 at 12. Defendants reason that because the sprint-racer does not meet this definition of "motor vehicle," it is not a "motor vehicle" under the Policy and is therefore not subject to the Motor Vehicle Exclusion.

The Court does not believe that the Policy contemplated such a definition. Although there is some ambiguity as to what "may be" means under this definition, Defendants clearly do not believe the definition is so broad as to encompass the sprint-racer, which hypothetically *may have been* transported or drawn upon a public highway or road, however illegal or unsafe. If Defendants did intend such a broad interpretation of "may be," the sprint-racer would meet this definition of motor vehicle, and injuries arising from its use would be excluded from coverage. Applying this logic, motorized wheelchairs, riding lawnmowers, and certain recreational vehicles also fail to qualify as motor vehicles under this definition, as they may not be transported or drawn upon a public road or highway. Again, however, motorized wheelchairs, riding lawnmowers,

13

and certain recreational vehicles are all Exceptions to the Motor Vehicle Exclusion. Because this construction excepts certain vehicles that would not be subject to exclusion, the Court finds it to be unreasonable.

   3. *Defendants' Third Definition*

Third, Defendants define "motor vehicle" as "a device which travels on public roads, transports people, and is covered by car insurance." Doc. No. 42 at 5. Based on the word "and," this definition requires all three of these characteristics for a device to be classified as a motor vehicle.

The Court has already addressed the "public roads" argument in Section III(A)(2) above. Also, because the sprint-device in question "could only carry one person," Defendants seemingly imply that the sprint-device does not meet the "transports *people*" requirement of this definition. Doc. No. 29 at 10. Of course, even a single-occupancy vehicle can transport people, one at a time. But even if a device must have the capacity to transport multiple people at once to qualify as a motor vehicle, the Court is nevertheless unpersuaded that the Policy reasonably contemplated such a definition. If simply lacking the capacity to transport multiple people at once was sufficient to disqualify a device from being a motor vehicle, motorized wheelchairs, riding lawnmowers, and certain single-occupancy recreational vehicles would not need to be explicitly excepted from the Motor Vehicle Exclusion—as single-occupancy devices, they would already not be considered "motor vehicles."

14

Defendants focus mostly on the "car insurance" requirement of this definition, arguing that "The intent of the parties was to exclude from the Policy vehicles used on streets and highways which should be covered by automobile insurance." Doc. No. 42 at 5; *see also* Doc. No. 29 at 10. The Court agrees that the parties did intend to exclude such vehicles from the Policy, but the Motor Vehicle Exclusion's Exceptions indicate that the Policy excludes more than just those vehicles. At least motorized wheelchairs and riding lawnmowers are not "vehicles used on streets and highways which should be covered by automobile insurance." Thus, motorized wheelchairs and riding lawnmowers would not be considered motor vehicles under this definition. But again, considering this Policy as a whole, it would be unreasonable to specifically except from the Motor Vehicle Exclusion devices which would already not qualify as "motor vehicles."

4. *Defendants' Fourth Definition*

Last, Defendants also define "motor vehicle" as "a self-propelled wheeled land vehicle designed for, intended to be used for, *or* actually used to transport persons or property over roads and highways." Doc. No. 29 at 10, 11 (emphasis added). The Court believes that its above analysis covers all parts of this proffered definition, with perhaps one exception.

The word "or" indicates that to qualify as a motor vehicle under this definition, a device need only be a self-propelled wheeled land vehicle *actually used* to transport persons or property over roads and highways. There is some ambiguity as to what

15

"actually used" means here, though it clearly does not refer to any self-propelled, wheeled device with the mere hypothetical capability of transporting people or property over roads and highways. Like a motorized wheelchair or a riding lawnmower, for example, the sprint-device in question would have hypothetically been capable of such a task, however unsafe or illegal. But if the definition was this broad, the sprint-device—as well as motorized wheelchairs and riding lawnmowers—would be classified as motor vehicles, and injuries arising out of their use would be excluded. This not only undermines Defendants' argument, but it also does not make sense considering motorized wheelchairs and riding lawnmowers are included as Exceptions to what is already classified as a motor vehicle per the Motor Vehicle Exclusion.

The Court believes that the "actually used" language refers to a vehicle like a golf cart. Although golf carts are not necessarily designed for or intended to be used to transport persons or property over roads and highways, they are sometimes actually used for these purposes. *See Pharr-San Juan-Alamo Indep. Sch. Dist. v. Tex. Pol. Subdivisions Prop./Cas. Joint Self Ins. Fund*, 642 S.W.3d 466 (Tex. 2022). Although Exception (e) to the Policy's Motor Vehicle Exclusion (the "Golf Cart Exception") excepts certain injuries arising from "golf carts owned by an insured person when used for golfing purposes," this understanding of the definition does not conflict with the Golf Cart Exception because the Golf Cart Exception applies narrowly to only golf carts owned by insured persons when used for golfing purposes. Doc. No. 30 at 43.

All this to say, the Court does not believe that the Policy reasonably contemplated this definition of "motor vehicle." Like the sprint-device, motorized wheelchairs and riding lawnmowers are not "actually used" to transport persons or property over roads and highways. Thus, they would not be classified as motor vehicles under Defendants' definition. Again, however, it does not make sense to except something that is not subject to the definition in the first place, and the Policy explicitly excludes certain injuries arising out of the use of motorized wheelchairs and riding lawnmowers from the Motor Vehicle Exclusion. *Id.*

5. *Conclusion*

Interpreting the Policy in a manner that harmonizes and gives effect to all provisions so that none are rendered meaningless, the Court believes that the term "motor vehicle," as used in the Policy's Motor Vehicle Exclusion, is, in this case, not reasonably subject to two or more interpretations, and is thus not ambiguous. *Gilbert*, 327 S.W.3d at 126. The Court concludes that the sprint-device in question is a motor vehicle that falls within the Policy's Motor Vehicle Exclusion.

B. *Did Caleb's injuries "arise out of the use" of a motor vehicle?*

Once again, the Policy's Motor Vehicle Exclusion excludes from coverage any "bodily injury or property damage *arising out of* the ownership, maintenance, *use*, occupancy, renting, loaning, entrusting, loading or unloading of any motor vehicle or trailer." Doc. No. 30 at 44 (emphasis added). Relying on the "arising out of" language, Defendants argue that "Caleb's death did not arise out of Defendant Crawford's

17

ownership, maintenance, use, occupancy, renting, loaning, entrusting, loading or unloading of the sprint-style device. . . . Caleb's death arose out of Defendant Crawford's failure to properly design and assemble the device in a safe manner." Doc. No. 29 at 14. Defendants continue:

> Caleb's death, of course, did not arise out of the inherent nature of the sprint-device as a motor vehicle. The incident occurred when Caleb's device landed on its side at a dirt-track event, a large amount of fuel spilled out, then trapped Caleb inside and engulfed him in flames. These allegations do not comport with the inherent nature of a 'motor vehicle,' and Caleb's death did not arise out of the use of the device.

*Id.* at 15.

Texas law requires that, "For liability to 'arise out of' the use of a motor vehicle, a causal connection or relation must exist between the accident or injury and the use of the motor vehicle." *Mid-Century Ins. Co. of Tex., a Div. of Farmers Ins. Grp. Of Cos. v. Lindsey*, 997 S.W.2d 153, 156 (Tex. 1999). The Fifth Circuit reads "a causal connection or relation" to mean "that there is but for causation, though not necessarily direct or proximate causation." *Lincoln Gen. Ins. Co. v. Aisha's Learning Ctr.*, 468 F.3d 857, 859 (5th Cir. 2006) (citing *Utica Nat'l Ins. Co. v. Am. Indem. Co.*, 141 S.W.3d 198, 203 (Tex. 2004)). "'Use' means 'to put or bring into action or service; to employ for or apply to a given purpose.'" *Id.* (quoting *LeLeaux v. Hamshire–Fannett Indep. Sch. Dist.*, 835 S.W.2d 49, 51 (Tex.1992)).

Defendants also cite the *Lindsey* factors (Doc. No. 29 at 15), which Texas courts use to help determine whether an injury arises out of the use of a vehicle:

18

> (1) the accident must have arisen out of the inherent nature of the automobile, as such; (2) the accident must have arisen within the natural territorial limits of an automobile, and the actual use must not have terminated; and (3) the automobile must not merely contribute to cause the condition to which produces the injury but must itself produce the injury.

997 S.W.2d at 157. Defendants do not analyze factors two or three. *See* Doc. No. 29 at 15-16.

Here, the live pleading in the Underlying Lawsuit alleges a causal connection between the July 10, 2021, accident and Caleb's use of the sprint-car. *See* Doc. No. 30 at 57, 60, 61. Applying the first *Lindsey* factor, the accident arose while the sprint-car was being used for one of its inherent purposes—racing. Second, the accident occurred within the sprint-car's natural territorial limits before its actual use—racing— terminated. Finally, consistent with the reasoning in *Lindsey*, the sprint-car caused, not merely contributed to, the conditions which produced the injury. Per the live pleading in the Underling Lawsuit, but for the use of the sprint-car for its intended purpose— racing—the accident and resultant injuries would not have occurred. *See* Doc. No. 30 at 60, 63.

C. *Duty to Defend and Duty to Indemnify*

The duty to defend and the duty to indemnify are "separate and distinct" obligations under Texas law. *Ryan*, 274 F.3d at 323. "These duties are independent, and the existence of one does not necessarily depend on the existence or proof of the other." *D.R. Horton-Tex., Ltd. v. Market Int'l Ins. Co.*, 300 S.W.3d 740, 745 (Tex. 2009).

Importantly, Texas law generally "only considers the duty-to-indemnify question justiciable after the underlying suit is concluded, unless 'the same reasons that negate the duty to defend likewise negate any possibility the insurer will ever have a duty to indemnify.'" *Northfield*, 363 F.3d at 529 (citing *Farmers Tex. County Mut. Ins. Co. v. Griffin*, 955 S.W.2d 81, 84 (Tex. 1997). Because the accident and resultant injuries arose out of the use of a motor vehicle, and because the Policy's Motor Vehicle Exclusion applies to those injuries, Allstate has no duty to defend or indemnify in the Underlying Lawsuit.

## IV. Conclusion

Because the accident and resultant injuries arose out of the use of a motor vehicle, and because the Policy's Motor Vehicle Exclusion applies to those injuries, the Court **GRANTS** Plaintiff's Motion for Summary Judgment. Doc. No. 21. The Court finds that Allstate has no duty to defend or indemnify in the Underlying Lawsuit. Consequently, the Court **DENIES as moot** Defendant Couch's Second Motion to Dismiss (Doc. No. 47).

**SO ORDERED.**

Signed July 16th, 2022.

_____
ED KINKEADE
UNITED STATES DISTRICT JUDGE